Carroll,  }
Feb. 1, 1910. }

## HUTCHINS *v.* BERRY *& a.*

Where a deed of a mill privilege reserves a preferential right to draw water for running machinery then used or thereafter to be installed in a certain gristmill, the measure of the right is not the capacity of the mill at the date of the conveyance, but the quantity of water reasonably required for the conduct of the gristmill business in the vicinity; and this quantity the owner of the gristmill right may use for any purpose he sees fit.

An account of the tolls taken at a gristmill, kept by a miller since deceased and purporting to be a record of all his receipts, is admissible to prove the volume of business done at the mill during the period covered by it; and the facts that the system adopted was a crude one and that the author of the record was under no obligation to keep an accurate account, while they may detract from the weight of the evidence, do not establish its incompetency.

BILL IN EQUITY. Facts found, and case transferred without final order from the June term, 1908, of the superior court, by *Chamberlin,* J. The proceeding is a branch of the same litigation heretofore before the court and reported 71 N. H. 117, 128; 72 N. H. 77, 211; 73 N. H. 310, 603, 611; and 74 N. H. 225, 598. The questions now presented relate to the extent of the gristmill right and the orders under which the receiver has been operating.

*Felker & Gunnison, Charles B. Hibbard, Arthur L. Foote, William J. Britton,* and *Henry F. Hollis (Mr. Hibbard* and *Mr. Hollis* orally), for the plaintiff.

*Leslie P. Snow, Sewall W. Abbott,* and *Oscar L. Young (Mr. Snow* orally), for the defendants.

PEASLEE, J. The case is now brought here to ascertain the meaning of the reservation of the so-called gristmill right. The reservation is as follows: " Excepting the privilege of drawing and using water for gristmill standing on the westerly side of said stream whenever there may be water in the stream or mill-pond for that purpose, it being understood that said gristmill is to use the water for running the machinery now in the same and any other additional machinery which may be put into the same or any other gristmill which may be substituted therefor, in preference to any other mills or machinery upon said privilege."

The thought of the parties, as expressed in the deed, was that

sufficient water was reserved to conduct the gristmill business of that vicinity; and that, if ascertainable, is the measure of the plaintiff's right. It would not necessarily be the amount of water used when the conveyance was made, for there is also the right to install additional machinery. It might be that amount, or it might be more. Experience only could determine that. A gristmill was then a well known institution. Physical conditions appeared to determine with considerable accuracy what territory would be tributary to it. It was the use for such a mill which was reserved. Experience proved that the use would remain nearly as it was. The average amount of water used has been about the same during the last fifty years. It is not impossible that the parties believed this would be so. True it is, the measure adopted was not a scientific one, nor easy of determination and application; but it is such as the parties chose to adopt, and the facts found on the issue of average use have disposed of many of the difficulties. The case is not embarrassed by a subsequent increase of use. Whether the test were the average use when the deed was given, or the average use at the present time, or the average for all provable time, the result is the same, for the amount has not varied. Whether at this late day the plaintiff might begin to increase his use if there should hereafter be a demand for more extensive gristmill facilities for that neighborhood, or whether his voluntary change of use will amount to an abandonment of such increase (if a right to it could hereafter arise), are questions not now before the court.

The wheel in use when the deed was given and others substituted for it since that date have a capacity of sixty-nine cubic feet per second; but the gristmill business has not been so extensive as to call for the use of all this power except at rare intervals, and then only for a short time. The plaintiff claims the right to draw sixty-nine cubic feet of water per second for ten hours a day. He says that the capacity of the old wheels is the measure of his right. No substantial basis for this claim has been found. It is not mentioned in the deed, and its adoption would conflict with the express provision for additional machinery. The reservation was of all the water the grantor could use to operate his then installed or thereafter procured machinery, limited only by the amount of grist brought to his mill. The conclusive answer to the plaintiff's claim that he might install additional gristmill machinery so as to constantly use sixty-nine cubic feet of water is that there would be no grist to grind. Neither the capacity of the wheels nor the extent of the machinery was the measure of right adopted by the parties. It was the amount of grist brought to the mill. As the business then was, and as it has been for the

half century which has since elapsed, it takes an average of thirty-eight cubic feet of water per second to do the grinding, and this is the limit of the plaintiff's preferential gristmill right. He may use this quantity of water for any purpose he sees fit. The rule in this state is too well settled to require further consideration. The "very explicit language" necessary to lead to a different conclusion (*Hutchins* v. *Berry*, 74 N. H. 225, and cases cited) is not found in this reservation. It is urged against this conclusion that the presiding justice found that the intent of the parties was to limit the use to gristmill purposes. So far as this was a ruling of law, it is not supported by the authorities. So far as it was a finding of fact, it is immaterial in this proceeding. *Horne* v. *Hutchins*, 72 N. H. 211, 214. The use of the water for general manufacturing purposes works no harm to the defendants. So long as the gristmill necessity is made the measure of quantity, they are fully protected from any diminution of the rights granted to their predecessor in title.

A question is also presented concerning the defendants' right to use the waste water. It was decided in *Horne* v. *Hutchins*, 71 N. H. 128, that this right ceased when the water was at the crest of the dam; that is, when there was no more waste water. An order was subsequently made at the trial term that the quantity used by the defendants be decreased when the water fell eighteen inches below the crest of the dam. Upon exception to this order, it was held that it could not be sustained unless there were facts in its favor not then reported. *Hutchins* v. *Berry*, 74 N. H. 225. In this proceeding the facts have been found. The plaintiff conceded that in practical operation his technical right to stop the use of waste water the moment the pond fell to the level of the crest of the dam could not be enforced. It has also been found that to attempt to do so would result in "a great waste of water over the dam." To avoid this, the plaintiff claimed that it was only necessary to wait until the water was an inch or two below the crest of the dam before turning down the defendants' gate, while their claim was that eighteen inches was not more than a reasonable margin. Upon this issue the presiding justice found that six inches was a proper margin, and modified the order accordingly. It is also found "that this is a reasonable regulation of the rights of the parties and more beneficial to each than it would be to attempt to hold the water exactly at the crest of the dam." Upon these facts, the order as now made is not open to objection.

Two exceptions to the admission of evidence remain to be considered. An "account of tolls taken at the mill," kept by Alphonzo Colby, the miller, from 1855 until the mill was burned in 1861, was offered "as being the record of the toll actually

taken at the gristmill" for that period. Colby is dead. Subject to exception, the book was admitted "as an account of business done in that mill." During the period in question Colby's wife was the owner of the mill, but it did not appear whether he conducted the business for himself or on her account; nor did it appear that the book was kept as a book of charges, or that it had any relation to the affairs of any one except the person keeping it. While the necessities of the case call for the admission of the evidence, yet there must be something beyond this to justify such a course. Account books and records of third parties are in the nature of hearsay, and to be admissible evidence must have some guaranty of reliability. If the keeper of the book is under a legal or perhaps even a moral duty to keep it accurately, it is admissible. *Lassone* v. *Railroad*, 66 N. H. 345; *Roberts* v. *Rice*, 69 N. H. 472. But when the book is a mere memorandum, such as a party might keep in a diary, it is said to lack the elements essential to distinguish it from hearsay in general. The value of the so-called account to the party offering it in evidence was not in what it contained, but in what it did not contain. It was used to show the small amount of business done at the gristmill. It is said that there was no duty, legal or moral, upon Colby to keep a correct account, and that if he forgot sometimes to set down the tolls taken, no one's rights were affected in any way, nor was he remiss in his duty to any superior.

In this account so lacking in apparent trustworthiness that it must be wholly rejected, or should it be admitted, and the objections to it be used to detract from its weight? The latter course seems the more reasonable. Colby evidently undertook to keep an account of all his receipts at the mill. It was his record of the volume of his business. There is nothing to show that he abandoned it, but on the contrary it continues up to the day the mill was destroyed by fire. This may well be termed an account kept as a matter of business. No sound financier would think of conducting business today without an account which would serve a like purpose. That the system adopted by the miller of 1855 was a crude one does not detract from the probable truthfulness of his transactions. If "it is sufficient if the entry was the natural concomitant of the transaction to which it relates and usually accompanies it" (*Fisher* v. *Mayor*, 67 N. Y. 73, 77), the ruling excepted to was not erroneous. The record was "an account of business done in that mill," and was properly received in evidence. It would seem that the account might also have been admitted as the declaration of a deceased person who had the means of knowledge and no interest to misrepresent, under the principle of *Lawrence* v. *Tennant*, 64 N. H. 532, and *Lane* v. *Hill*, 68 N. H. 275, 281.

Evidence of the amount of grain shipped to the mill in 1881–3 is excepted to as too remote to be of value on the question of the extent of the business in 1855. This exception is disposed of by the way in which the evidence was offered and received. It was ruled in upon the defendants' offer to connect it with the use in 1855 by the testimony of two witnesses. Whether this was or was not subsequently done is not shown by the case, nor is it material here. If the defendants failed to perform the conditions upon which the evidence was admitted, it did not become a part of the proof in the case and of course was not considered.

*Case discharged.*

YOUNG, J., did not sit: the others concurred.